
FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEB 0 6 2020
DATE
Gonzalez
FOR CHIEF JUSTICE

This opinion was
filed for record
at 8 a.m. on Feb 6, 2020
Susan L. Carlson
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 96775-0 |
| | ) | |
| v. | ) | |
| | ) | |
| NAZIYR YISHMAEL, | ) | |
| | ) | |
| Petitioner. | ) | Filed  FEB 0 6 2020 |
| | ) | |

GONZÁLEZ, J.— Admission to the practice of law requires years of graduate level study either with a practicing lawyer or at a law school. It requires passage of a rigorous bar examination on a wide range of topics. In addition, bar applicants must satisfy character and fitness requirements. Once admitted, lawyers join a noble profession and become officers of the court, obligated to conduct themselves ethically under the Rules of Professional Conduct. When lawyers break the rules, they are subject to discipline. When lawfully practicing attorneys cause harm, malpractice insurance and the victims' compensation fund can provide some relief for their clients.

1

By contrast, the unlawful practice of law often causes harm without any of the protections for malpractice by lawyers. Because these harms are predictable, the unlawful practice of law is a crime. RCW 2.48.180(3). This case is illustrative. Victims in this case became homeless, were jailed, and lost almost everything they owned.

This court has the "exclusive power to regulate the practice of law," and in accordance with constitutional separation of powers principles, our legislature has not attempted to define the "practice of law." *Hagen & Van Camp, P.S. v. Kassler Escrow, Inc.*, 96 Wn.2d 443, 445, 635 P.2d 730 (1981) (citing WASH. CONST. art. IV, § 1). The "practice of law," however, has been defined in common law and, more recently, a court rule, GR 24.

Naziyr Yishmael, who is not an attorney, advised clients that they could "homestead" in apparently abandoned properties and, after a period of time, acquire title through adverse possession. After some of his clients were arrested for taking up residence in other people's houses, he was charged with and convicted of misdemeanor unlawful practice of law. He contends his conviction must be reversed for five reasons. He contends the jury was improperly instructed that the unlawful practice of law is a strict liability offense. He contends the court's use of GR 24 to define the practice of law violates separation of powers; he contends this use amounts to a comment on the evidence. He contends that the

statute is unconstitutionally vague. Finally, he contends that there was insufficient evidence presented to sustain his conviction. Finding no error, we affirm.

FACTS

In October 2014, four people were arrested. They were among many people who had been advised by Yishmael that they could take up residence in apparently abandoned foreclosed homes and, by changing the locks, moving in, improving the properties, and filing a variety of papers with the recorder's office, acquire title through adverse possession. Yishmael charged $7,000-$8,000 for his advice and assistance in adversely possessing homes. His clients also spent thousands of dollars repairing and improving the properties. Some lost almost everything they owned.

Yishmael was charged with several crimes, including theft and the unlawful practice of law. He testified in his own defense. Yishmael did not dispute that he gave his clients advice on homesteading, adverse possession, and talking with police who might challenge his clients' right to be in the homes, and that he offered assistance in completing documents to be filed with the county recorder's office. He also testified that he never held himself out to be a lawyer and, based on his review of the unlawful practice of law statutes in Title 2 RCW, he did not believe he was practicing law.

Both sides offered expert testimony from law professors. Professor David Boerner testified at length about the meaning of "practice of law." Boerner was a member of the committee that defined the practice of law and proposed GR 24 to codify that definition. Professor Gregory Silverman testified at length on adverse possession, foreclosure, and this court's opinion in *Bain v. Metropolitan Mortgage Group, Inc.*, 175 Wn.2d 83, 285 P.3d 34 (2012).

During trial, Yishmael moved to dismiss the unlawful practice of law charge. He argued that the statute violated the First Amendment to the United States Constitution and was unconstitutionally vague. He also objected to the admission of GR 24 and its use in crafting the jury instructions. Yishmael proposed instructions that would have required the State to establish he "unlawfully and knowingly practiced law, or held himself out as entitled to practice law." Clerk's Papers (CP) at 512. Ultimately, the jury was instructed that "[a] person commits the crime of Unlawful Practice of Law when, not being an active member of the State Bar, he practices law." CP at 550. The jury was also instructed that

> [t]he "practice of law" means the application of legal principles and judgment with regard to the circumstances or objectives of another entity or person(s) which requires the knowledge and skill of a person trained in law. This includes giving advice or counsel to others as to their legal rights or the legal rights or responsibilities of others for fees or other consideration. It also includes the selection, drafting, or completion of legal documents or agreements which affect the legal rights of an entity or person(s).

4

CP at 552. This definition largely mirrors the first two provisions of GR 24. The to-convict instruction did not require the jury to find Yishmael knowingly practiced law.

The jury acquitted Yishmael of the theft and theft-related charges. It found him guilty of the unlawful practice of law charge. Yishmael was sentenced to 364 days in jail with all but 5 days suspended. The Court of Appeals affirmed, and we granted review. *State v. Yishmael*, 193 Wn.2d 1002 (2019).

ANALYSIS

The first four issues in this case present questions of law that are reviewed de novo. *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004) (citing *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994), overruled in part on other grounds by *Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019)). Yishmael also challenges the sufficiency of the evidence, which has a more deferential standard that we will discuss below.

1. Strict Liability

First, we must decide whether the unlawful practice of law, as charged here, is a strict liability offense. If not, then the State was improperly relieved of the burden of proving Yishmael acted with knowledge and reversal would be required. Historically, strict liability offenses were disfavored in our legal traditions. At the time our nation was founded, crimes "generally constituted only from concurrence

of an evil-meaning mind with an evil-doing hand." *Morissette v. United States*, 342 U.S. 246, 251, 72 S. Ct. 240, 96 L. Ed. 288 (1952). Requiring the State to prove both a bad act and a bad intent goes back many more centuries. *Id.* at 250 n.4 (citing 2 FREDERICK POLLACK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I, at 448-511 (2d ed. 1899)).

But under our constitutional system, our legislature has the plenary power to criminalize conduct regardless of whether the actor intended wrongdoing. *State v. Bash*, 130 Wn.2d 594, 604, 925 P.2d 978 (1996) (citing *State v. Rivas*, 126 Wn.2d 443, 452, 896 P.2d 57 (1995)). We call these crimes strict liability crimes. *See, e.g., State v. Bradshaw*, 152 Wn.2d 528, 532, 98 P.3d 1190 (2004). As our society has become more and more complicated, our legislatures have created more strict liability offenses as a matter of policy. *Morissette*, 342 U.S. at 255. Generally, legislatures create strict liability offenses to protect the public from the harms that have come with modern life by putting the burden of care on those in the best position to avoid those harms. *Id.* As Justice Robert Jackson summarized the legislative justification for the creation of strict liability offenses, "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.* at 256.

Yishmael contends that unlawful practice of law is not a strict liability offense and that the jury should have been instructed that the State had to prove that he knowingly (and not just unlawfully) practiced law. This turns, ultimately, on whether the legislature intended to create a strict liability crime. To determine the legislature's intent, we start with the language of the statute, the statute's context, and the interplay with related statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002) (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed. 2000)).

The legislature has criminalized the unlawful practice of law in the state bar act, ch. 2.48 RCW. Under the act, it is the unlawful practice of law when

> (a) A nonlawyer practices law, or holds himself or herself out as entitled to practice law;
> (b) A legal provider holds an investment or ownership interest in a business primarily engaged in the practice of law, *knowing* that a nonlawyer holds an investment or ownership interest in the business;
> (c) A nonlawyer *knowingly* holds an investment or ownership interest in a business primarily engaged in the practice of law;
> (d) A legal provider works for a business that is primarily engaged in the practice of law, *knowing* that a nonlawyer holds an investment or ownership interest in the business; or
> (e) A nonlawyer shares legal fees with a legal provider.

RCW 2.48.180(2) (emphasis added). The first offense is a gross misdemeanor. RCW 2.48.180(3)(a). Three of the subsections have a statutory intent element listed: knowledge. RCW 2.48.180(2)(b)-(d). Yishmael was charged here under

7

one of the two subsections that lack a statutory intent element, RCW

2.48.180(2)(a).

We find considerable reason to affirm based simply on the plain text of the

statute. The statute has five subsections. Three of these subsections contain an

intent element. Two, including the one relevant here, do not. This is evidence the

legislature intended to make it a strict liability offense when "[a] nonlawyer

practices law, or holds himself or herself out as entitled to practice law." RCW

2.48.180(2)(a). Analogously, we have held that the crime of commercial fishing

without a license could be proved by proof of conduct statutorily defined as "acting

for commercial purposes," regardless of whether the State proved the defendant

intended wrongful conduct. *State v. Mertens*, 148 Wn.2d 820, 826, 64 P.3d 633

(2003) (quoting former RCW 77.15.110(1) (1998)). We noted that "the legislature

was not silent with regard to intent; one of the means for establishing the 'acting

for commercial purposes' element included proof that the defendant was acting

with intent to sell the shellfish." *Id.* at 828 (quoting former RCW 77.15.110(1).

But "all of the other alternative means for establishing this element of the crime are

based on conduct alone." *Id.* at 828; *see also Russello v. United States*, 464 U.S.

16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) ("'[W]here Congress includes

particular language in one section of a statute but omits it in another section of the

same Act, it is generally presumed that Congress acts intentionally and purposely

8

in the disparate inclusion or exclusion.'"(alteration in original) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).[1]

While this is strong evidence of legislative intent, given the long tradition against strict liability crimes, it is not determinative. In such cases, we turn next to legislative history. *Bash*, 130 Wn.2d at 605. For example, we found the legislature's rejection of model language that included an intent element helpful in determining that the legislature intended to create a strict liability crime in *State v. Cleppe*, 96 Wn.2d 373, 379, 635 P.2d 435 (1981), and *State v. Henker*, 50 Wn.2d 809, 812, 314 P.2d 645 (1957). In this case, unfortunately, we have found no helpful legislative history.

*Bash* also articulated eight nonexclusive considerations to help us determine whether the legislature intended to create a strict liability offense. *Bash*, 130 Wn.2d at 605-06 (citing 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 3.8, at 341-44 (1986)). Under *Bash*, we consider:

> (1) . . . the background rules of the common law, and its conventional mens rea element; (2) whether the crime can be characterized as a "public welfare offense" created by the Legislature; (3) the extent to which a strict liability reading of the statute would encompass seemingly entirely innocent conduct; (4) and the harshness of the penalty. Other considerations include: (5) the seriousness of the harm to the public; (6) the ease or difficulty of the defendant ascertaining the true facts; (7) relieving the prosecution of

---

[1] We recognize the United States Supreme Court did not find this principle determinative in *Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 2008, 192 L. Ed. 2d 1 (2015), though the court recognized it presented "strong evidence" that Congress did not intend to create a mental state element.

difficult and time-consuming proof of fault where the Legislature thinks it important to stamp out harmful conduct at all costs, "even at the cost of convicting innocent-minded and blameless people"; and (8) "the number of prosecutions to be expected."

*Id.* (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 341-44 (1986)). We consider each factor in turn.

(1) COMMON LAW. The common law does not speak directly on whether the unlawful practice of law is a strict liability offense. Limiting the practice of law to those admitted to the bar has deep roots running back to at least the 13th century. Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 QUINNIPIAC L. REV. 97, 103 (2018) (citing Francis Trowbridge vom Baur, *An Historical Sketch of the Unauthorized Practice of Law*, 24 UNAUTHORIZED PRAC. NEWS 1, 3 (1958)). Territorial judges in Washington had the power to punish the unlawful practice of law through fines and imprisonment through their contempt powers, which appear to be a codification of an existing practice. STATUTES OF THE TERRITORY OF WASHINGTON ch. 59, § 668 (1869). *See generally In re Unauthorized Practice of Law by McCallum*, 186 Wash. 312, 315, 57 P.2d 1259 (1936) (noting that "[w]hether or not a statute for such purpose was necessary, this court . . . clearly has the power to punish as for contempt any one who, without authority, practices law or holds himself out as entitled to do so").

Unlawful practice of law has been a statutory gross misdemeanor in Washington State since at least 1921. LAWS OF 1921, ch. 126, § 22. The State has prosecuted the unlawful practice of law at least since 1923. *State v. Chamberlain*, 132 Wash. 520, 521, 232 P. 337 (1925). Given, perhaps, that *Chamberlain* was an appeal from the dismissal of charges before trial, we had no occasion to discuss whether unlawful practice was a strict liability crime. The underlying statute was silent on that point, though Chamberlain was charged with "'willfully and unlawfully'" holding himself out as a lawyer. 132 Wash. at 521 (quoting indictment); LAWS OF 1921, ch. 126.

We conclude the common law is not particularly helpful to determine whether unlawful practice of law is a strict liability offense.

(2) "PUBLIC WELFARE OFFENSE." The second *Bash* factor asks whether the crime can be categorized as a "public welfare offense." *Bash*, 130 Wn.2d at 605. This factor strongly favors finding the unlawful practice of law is a strict liability crime.

As Justice Jackson wrote, public welfare offenses

> do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it

which the law seeks to minimize. . . . Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation.

*Morissette*, 342 U.S. at 255-56. This is a fair description of the type of crime here. Unlawful practice of law was not a crime at common law, and it protects the public from the harm of poor legal advice.[2] Society might reasonably expect those unlicensed to practice law should not practice law.

We find no evidence in our case law that significant penalties are exacted for unlawful practice of law. Nor have the parties brought any to our attention. Very few prosecutions have been noted in the common law, and prosecutions are rare enough there is not even a pattern jury instruction for the crime. The penalty in this case was small. Even though the judge noted Yishmael had not yet started making restitution on a prior embezzlement conviction, he was still given only 5 days in jail and 30 days of work crew. This factor weighs in favor of a strict liability offense.

(3) INNOCENT CONDUCT. Next, we turn to "the extent to which a strict liability reading of the statute would encompass seemingly entirely innocent conduct." *Bash*, 130 Wn.2d at 605. Sometimes, without an intent element,

---

[2] We are not unmindful of the criticism that restricting legal practice to lawyers may have limited legal services in unfortunate ways.

seemingly innocent conduct could be criminalized. *E.g.*, *Rehaif v. United States*, 588 U.S. __, 139 S. Ct. 2191, 2197, 204 L. Ed. 2d 594 (2019). *Rehaif* concerned a prosecution under a federal statute that criminalized gun possession while unlawfully being in the United States. After Rehaif's student visa had expired, he went shooting at a gun range and was charged with illegal possession of a firearm. *Id.* at 2194. The Supreme Court held that the government had to prove Rehaif knew he was unlawfully in the country. *Id.* at 2200. While much of the opinion concerned the scope of the statute's requirement that the defendant "knowingly" violated the law, the Court also stressed that since it was Rehaif's status that made otherwise innocent conduct criminal, the government had the burden of proving the defendant knew his status. *Id.* at 2197. But Yishmael has not been charged with holding himself out as a lawyer, and his status is not at issue. *Rehaif* is not applicable.

Yishmael contends that treating this crime as a strict liability offense would criminalize the everyday actions of "bank tellers, receptionists, nurses, and police officers, all of whom explain legal principles to persons as part of their daily work," Pet'r's Suppl. Br. at 9, and render "basic teaching of constitutional rights in school classrooms" and "[s]haring legal forms or computer programs" criminal, Pet. for Review at 7. But providing general information about the law is not, by definition, the practice of law. GR 24(d). Selling legal forms is also, by definition,

not the practice of law. GR 24(b)(8). This factor weighs in favor of finding a strict liability offense.

(4) PENALTY. The harshness of the potential penalty also speaks to whether the legislature intended a strict liability offense. "'[T]he greater the possible punishment, the more likely some fault is required; and, conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.'" *Bash*, 130 Wn.2d at 608-09 (quoting 1 LAFAVE & SCOTT, supra, § 3.8, at 343 (1986)). A single violation of the unlawful practice of law statute is a gross misdemeanor, subject to a possible 364 days in jail. RCW 2.48.180(3)(a); RCW 9A.20.021. Subsequent violations, "whether alleged in the same or in subsequent prosecutions," are class C felonies. RCW 2.48.180(3)(b).

Generally, a first offense would be a misdemeanor. This weighs in favor of a strict liability offense. The fact that the unlawful practice of law could be elevated to a felony on a second charge when charged in a single prosecution weighs somewhat against the crime being a strict liability offense. But if this case is representative, Yishmael faces a felony charge only if he practices law without a license again—at which point he cannot credibly claim ignorance. However, it is certainly possible under our statute that a person could face multiple felony counts for unlawful practice of law. This weighs somewhat in favor of finding it is not a

14

strict liability offense. *See, e.g., State v. Anderson*, 141 Wn.2d 357, 365, 5 P.3d 1247 (2000).

(5) HARM TO THE PUBLIC. We also consider the potential harm to the public. *Id.* at 365. In *Anderson*, we found a felon's unwitting possession of firearms presented little risk of harm to the public, while in *Bash*, we found animal attacks presented serious risk of harm to the public. *Id.*; *Bash*, 130 Wn.2d at 609. Victims of unlicensed practice of law have faced deportation; had money misappropriated; and, as this case demonstrated, have been arrested and jailed. *See, e.g., Paniagua-Jimenez v. Gonzales*, 158 F. App'x 846, 847 (9th Cir. 2005); *Tegman v. Accident & Med. Investigations, Inc.*, 150 Wn.2d 102, 106, 75 P.3d 497 (2003). The harm can be significant. This weighs in favor of strict liability.

(6) DIFFICULTY IN ASCERTAINING "TRUE FACTS." As a leading treatise puts it, "[t]he harder to find out the truth, the more likely the legislature meant to require fault in not knowing; the easier to ascertain the truth, the more likely failure to know is no excuse." 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 5.5(a) at 518-19 (3d ed. 2017). Yishmael suggests that he should not have to consult a court rule to determine whether his conduct is criminal. This point has some force, but nowhere in chapter 2.48 RCW does the legislature define "practice of law." It instead declares certain activities are the "unlawful practice of law," RCW 2.48.180(2), including the practice of law by a nonlawyer. As the

15

Court of Appeals observed, "GR 24 is a publicly available court rule defining the practice of law. It would not have been difficult for Yishmael to read it and learn that the services he was offering constituted the practice of law." *State v. Yishmael*, 6 Wn. App. 2d 203, 219, 430 P.3d 279 (2018). Even without the court rule, it is not difficult to ascertain that filling out legal documents for a fee is the practice of law. This factor weighs in favor of strict liability.

(7) LEGISLATIVE CALCULATION. The seventh factor looks to whether the legislature made the calculation that the value of preventing the harmful conduct outweighs "'the cost of convicting the innocent-minded and blameless.'" *Bash*, 130 Wn.2d at 606 (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 341-44 (1986)). In the somewhat analogous case of prosecution for commercial fishing without a license, we noted that if the State was required to prove actual intent, a defendant could "easily claim noncommercial intent, allowing fishermen to circumvent personal daily limits and potentially plac[e] undue pressure on natural resources." *Mertens*, 148 Wn.2d at 830 (citing *State v. Wingate*, 95-1874 (La. App. 1 Cir. 02/23/96), 668 So. 2d 1324, 1329). This factor weighs in favor of strict liability.

(8) THE NUMBER OF PROSECUTIONS TO BE EXPECTED. "The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to go into the issue of fault; the greater the number of prosecutions, the more likely the legislature meant to impose liability without

16

regard to fault." 1 LAFAVE & SCOTT, supra, § 5.5(a) at 520 (2017). As in *Bash*, there is nothing in the record, on this point. However, given the very few prosecutions mentioned in the appellate record it is likely the legislature did not intend many prosecutions. This factor weighs against strict liability.

Taken together, the plain language of the statute and the *Bash* factors lead us to the conclusion that unlawful practice of law, as charged here, is a strict liability crime. The trial court did not err in so finding.

2. GR 24

A. SEPARATION OF POWERS. Yishmael argues that the use of GR 24 to define practice of law amounts to an unconstitutional delegation of power from the legislature to the judiciary. We find it does not.

Our constitutional system divides power into many different hands in order to protect liberty. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009). Under our separation of powers system, each branch of government has its own appropriate sphere of activity and inviolate fundamental functions. *Id.* (citing Philip A. Talmadge, *Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems*, 22 SEATTLE U. L. REV. 695 (1999); *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)). "However, separation of powers 'does not depend on the branches of government being hermetically sealed off from one another.' It recognizes that the separate

17

branches must remain partially intertwined in order to 'maintain an effective system of checks and balances, as well as an effective government.'" *Id.* (citation omitted) (quoting *Carrick*, 125 Wn.2d at 135). Instead, separation of powers is violated when "the activity of one branch threatens the independence or integrity or invades the prerogatives of another branch." *State v. Chavez*, 163 Wn.2d 262, 273, 180 P.3d 1250 (2008) (citing *Spokane County v. State*, 136 Wn.2d 663, 667, 966 P.2d 314 (1998)).

Yishmael argues, correctly, that it is a legislative function to define the elements of a crime. *State v. Wadsworth*, 139 Wn.2d 724, 734, 991 P.2d 80 (2000). He further contends that the legislature has the sole power to define the elements of a crime. We disagree. Often, it is the role of the courts to supplement the statutory law to define terms or even to articulate implied elements of a crime. *E.g.*, *State v. Sullivan*, 143 Wn.2d 162, 175-76, 19 P.3d 1012 (2001) (using dictionaries to define "judicial process" in RCW 9.12.010); *State v. Crediford*, 130 Wn.2d 747, 755, 927 P.2d 1129 (1996) (holding the crime of driving under the influence contains implied element).

It is well established that the legislature does not violate separation of powers by relying on the common law to supplement the criminal code. *See Chavez*, 163 Wn.2d at 273; *see also* RCW 9A.04.060 ("The provisions of the common law relating to the commission of crime and the punishment thereof,

insofar as not inconsistent with the Constitution and statutes of this state, shall supplement all penal statutes of this state."). That is because "it is within this court's 'appropriate sphere of activity' to determine what a particular statute means," and to that end, we may turn to the common law to define terms in criminal statutes. *Hale*, 165 Wn.2d at 506; *State v. Garcia*, 179 Wn.2d 828, 837, 318 P.3d 266 (2014) (citing *State v. Engel*, 166 Wn.2d 572, 578-79, 210 P.3d 1007 (2009)).

It is the role of the legislature to legislate. CONST. art. II. The state bar act memorializes our legislature's attempt to regulate the practice of law, to acknowledge and formalize the existence of the state bar, to organize admission to practice, and generally to create a framework for the practice of law in Washington State. Ch. 2.48 RCW; LAWS OF 1933, ch. 94. But the bar act did not arise out of a vacuum; this court and its agents were already performing many of these functions. In earlier times, this court admitted lawyers to practice after examination of their eligibility, skills, and moral character. *E.g.*, LAWS OF 1895, ch. 91, § 3; *In re Admission to Bar of Takuji Yamashita*, 30 Wash. 234, 239, 70 P. 482 (1902) (disapproval noted at 143 Wn.2d xxxiii-lix (2001)). We did not need the state bar act to do this: "[o]ne of the basic functions of the judicial branch of government is the regulation of the practice of law. *Wash. State Bar Ass'n v. State*, 125 Wn.2d 901, 907, 890 P.2d 1047 (1995) (citing *Graham v. State Bar Ass'n*, 86 Wn.2d 624,

19

631, 548 P.2d 310 (1976)). "'The practice of law is so intimately connected with the exercise of judicial power in the administration of justice that the right to define and regulate the practice naturally and logically belongs to the judicial department of the state government.'" *Id.* at 908 (quoting 7 AM. JUR. 2D *Attorneys at Law* § 2, at 55-56 (1980)).

Yishmael also argues that "[t]he legislature cannot constitutionally delegate its legislative authority to other branches of government," suggesting that the use of GR 24 to define the practice of law is a violation of separation of powers. Pet'r's Suppl. Br. at 14-15 (citing *Amalg. Transit Union Local 587 v. State*, 142 Wn.2d 183, 234, 11 P.3d 762 (2001)). But we have long held that this court has the exclusive authority to create the rules and regulations that govern the bar. *E.g.*, *Hagen & Van Camp*, 96 Wn.2d at 452-53 (citing cases). The use of GR 24 to define the practice of law poses no risk to separation of powers. Just the opposite: the court's adopting a rule defining the practice of law is *inherently* the court's prerogative. *See id.* We find no separation of powers violation in the use of GR 24.

B. COMMENT ON THE EVIDENCE. Yishmael contends that the use of GR 24 to define the practice of law was an improper comment on the evidence. We find it was not.

Our constitution prohibits judges from commenting on the evidence in a jury trial. CONST. art. IV, § 16. Instead, judges are to "declare the law." *Id.* Jury instructions that accurately state the law are not improper comments on the evidence. *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015) (quoting *State v. Woods*, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001)). By contrast, jury instructions that essentially resolve factual issues *are* improper comments on the evidence. *Id.* In *Brush*, for example, a domestic violence sentencing aggravator was available if the jury found that the abuse "was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim . . . manifested by multiple incidents over a prolonged period of time." RCW 9.94A.535(3)(h)(i); *Brush*, 183 Wn.2d at 555. The pattern jury instruction used in that case instructed the jury that "'[a]n "ongoing pattern of abuse"' means multiple incidents of abuse over a prolonged period of time. The term "prolonged period of time" means more than a few weeks.'" *Brush*, 183 Wn.2d at 555 (quoting record), 557. We found this jury instruction was an improper comment on the evidence because it resolved a factual question that was given to the jury and because it relieved the State of its burden to prove the aggravator. *Id.* at 557.

By contrast, here, the judge did not improperly comment on the evidence. He merely presented a jury instruction that properly defined "practice of law." We find no error.

21

## 3. Vagueness

Yishmael contends that the statute is unconstitutionally vague.[3] As the challenger, he bears the burden of establishing that the statute is unconstitutional. *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009) (citing *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 561, 29 P.3d 709 (2001)). Essentially, he contends that the mere fact the State felt compelled to bring in an expert to testify as to the meaning of "practice of law" shows that the statute is vague. We disagree. "A statute is vague if either it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it, or if it does not provide standards sufficiently specific to prevent arbitrary enforcement." *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004) (citing *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990)). Arbitrary enforcement is not at issue here.

The mere fact there are undefined terms in a statute does not render the statute unconstitutionally vague. When terms are undefined, "the reviewing court may 'look to existing law, ordinary usage, and the general purpose of the statute' to determine whether 'the statute meets constitutional requirements of clarity'." *State v. Hunt*, 75 Wn. App. 795, 801, 880 P.2d 96 (1994) (quoting *State v. Russell*,

---

[3] Yishmael contends the statute is unconstitutional both facially and as applied. But he does not develop his facial argument, interweaving it with his as-applied challenge throughout. *See, e.g.*, Pet'r's Suppl. Br. at 17-18; Appellant's Opening Br. at 19-23 (Wash. Ct. App. No. 76802-6-I (2017)). We will only consider his vagueness argument as applied to his case.

69 Wn. App. 237, 245, 848 P.2d 743 (1993)). In *Hunt*, the Court of Appeals rejected the argument that "practice of law" was unconstitutionally vague in part because case law provided a sufficient definition. *Id.* at 801-02 (citing *In re Disciplinary Proceedings Against Droker*, 59 Wn.2d 707, 719, 370 P.2d 242 (1962); *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 586, 675 P.2d 193 (1983) (plurality opinion)). Hunt had settled claims, researched the law, applied the results of his research to his clients, and prepared liens. *Id.* at 803-04. Similarly, Yishmael researched the law, advised his clients on filing legal documents, and advised them on how to use the law to acquire property. Under our long-standing case law, this is the practice of law; the fact a court rule makes that clearer does not make the statute vague. *See Chamberlain*, 132 Wash. at 524 (defining the practice of law).

4. Sufficiency

To prevail in a sufficiency claim, Yishmael "must show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Allen*, 159 Wn.2d 1, 7, 147 P.3d 581 (2006) (citing *State v. Finch*, 137 Wn.2d 792, 835, 975 P.2d 967 (1999) (plurality opinion)). "Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt." *State v. DeVries*, 149 Wn.2d

842, 849, 72 P.3d 748 (2003) (citing *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

The State presented evidence that taken in the light most favorable to the prosecution, Yishmael gave legal advice for a fee. Yishmael did not dispute that he gave his clients advice on homesteading, adverse possession, and talking with the police, and that he offered assistance in completing documents to be filed with the county recorder's office. This is sufficient to establish the charge.[4]

## CONCLUSION

We hold that the unlawful practice of law, as charged here, is a strict liability offense. We hold that the use of GR 24 did not violate separation of powers and did not constitute an unconstitutional comment on the evidence. We find that the statute is not unconstitutionally vague as applied to Yishmael's conduct. Finally, we find the State presented sufficient evidence to sustain the conviction. Accordingly, we affirm.

---

[4] We respectfully disagree with the dissent that this is an appropriate case to examine the First Amendment implications of the state bar act, ch. 2.48 RCW. The parties have neither briefed the issue nor developed the record.

Gonzáles, J.

WE CONCUR:

Fairhurst, J.P.T.

Stephens, C.J.

No. 96775-0

WIGGINS, J. (dissenting)—For centuries, the common law has held antipathy for strict liability crimes. As our discussion will show, the proper treatment of Naziyr Yishmael's case would lead this court to hold that the crime of practicing law as a nonlawyer has a knowledge element.

In 18th century England, there was "[u]nqualified acceptance" that essentially all crimes required a mental element. *Morissette v. United States*, 342 U.S. 246, 251, 72 S. Ct. 240, 96 L. Ed. 288 (1952). As the United States took shape, the idea that crimes are "a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand . . . took deep and early root in American soil." *Id.* at 251-52. It is important to remember those traditions in a case like this. As the United States Supreme Court warned in *Morissette*, judicial creation of a crime without an intent element risks "radically . . . chang[ing] the weights and balances of the scales of justice" because "[t]he purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries." *Id.* at 263. The majority takes a step away from that tradition by holding that this crime lacks a mental element.

*Morissette* illustrates how this case should be resolved. Defendant Morissette was convicted of converting the property of the United States government. 342 U.S. at 248. Morissette's purported crime was converting spent practice bomb casings from

the disorganized heaps in which they lay on a "wooded and sparsely populated area of Michigan," which was government property. *Id.* at 247. Morissette transported the casings "in broad daylight, in full view of passers-by, without the slightest effort at concealment." *Id.* at 248. At trial, Morissette "testified that from appearances he believed the casings were cast-off and abandoned, that he did not intend to steal the property, and took it with no wrongful or criminal intent." *Id.* at 248-49. The trial court ruled that it did not matter whether Morissette believed the property was abandoned; rather, it mattered only whether Morissette took the property from government property. *Id.* at 249. Both parties agreed that Morissette took government property, meaning that his only defense was arguing lack of a mental element *See id.* In light of the judge's ruling—including the judge's instruction to the jury that "'if you believe either side, [Morissette] is guilty'"—the jury duly returned a guilty verdict. *Id.*

Writing for an essentially unanimous court,[1] Justice Robert Jackson reversed, returning to the bedrock principles noted above. Noting, among other things, that "[t]he contention that an injury can amount to a crime only when inflicted by intention is . . . as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil," the Supreme Court held that that the Government must prove a mental element to convict a defendant of the crime charged in *Morissette*. *Id.* at 250, 263-64, 271.

---

[1] Justice William O. Douglas concurred in the result without writing, and Justice Sherman Minton did not participate. *Morissette*, 342 U.S. at 276. There was no dissent. *Id.*

The proper treatment of Yishmael's case would lead this court to the same result. Just like Morissette, Yishmael was never proved to have had any ill intent; rather, he testified, "I did not knowingly practice law." 8 Verbatim Report of Proceedings (VRP) at 863. Just as Morissette believed the property he took was abandoned, Yishmael believed that "unauthorized practice of law was assisting someone with court documents and representing them in court in that fashion," not giving advice for a fee as he did. *Id.* Nothing in the record indicates that he held himself out as a lawyer but rather the opposite. 6 VRP at 488-89. But the evidence Yishmael presented of his innocent intent—never disputed by the State—was of no use, for just as in *Morissette*, the court ruled that there is no mental element in the crime of unlawful practice of law. The same concerns that motivated the Supreme Court in *Morissette* apply here, and, as the Supreme Court did in *Morissette*, we should reverse.

In light of the long-standing tradition cautioning against the judicial creation of strict liability crimes, as well as our own case law, I would hold that the crime of practicing law as a nonlawyer has a knowledge element as Yishmael argues. Because the omission of that element from the jury instructions was not harmless, I would reverse and remand for a new trial.

The majority also opens up the possibility that this law criminalizes far more than just Yishmael's activities. Under the majority's decision, it may be a crime to merely give someone the most *basic* legal advice without any payment or consideration. Nothing in the statute, the court rule, or our precedent indicates that such an outcome is warranted. Further, the First Amendment to the United States Constitution cautions strongly against it.

3

For these reasons, I respectfully dissent.

ANALYSIS

I.   Unlawful practice of law requires proof of knowledge

Our law strongly disfavors strict liability crimes. *State v. Bash*, 130 Wn.2d 594, 606, 925 P.2d 978 (1996) (citing cases); *see also State v. Anderson*, 141 Wn.2d 357, 363, 5 P.3d 1247 (2000) (reaffirming the same). This principle has been part of the common law tradition for centuries. *See Bash*, 130 Wn.2d at 606. Thus, while "[t]he legislature has the authority to create a crime without a mens rea element," we have typically held a crime lacks a mental element only when the "legislative intent to omit a mens rea element is clear." *State v. Bradshaw*, 152 Wn.2d 528, 532, 535, 98 P.3d 1190 (2004) (capitalization omitted).

Here, it is *not* clear that the legislature intended to omit a mental element. Rather, everything indicates the legislature intended to *include* a mental element.

A. Plain language suggests that a mental element is required

I first analyze the plain language of the statute. *See Bash*, 130 Wn.2d at 605 (the first step to determining whether the legislature created a strict liability crime is analyzing the plain language of the statute); *see also Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (plain language is primary source of legislative intent). Here, the plain language of the statute strongly suggests that the crime of practicing law as a nonlawyer has a knowledge element.

The language at issue is found in two portions of RCW 2.48.180. First is subsection .180(3)(a), which reads, "Unlawful practice of law is a crime." Second is subsection .180(2), which reads in full:

4

> (2) The following constitutes unlawful practice of law:
>
> (a) A nonlawyer practices law, or holds himself or herself out as entitled to practice law;
>
> (b) A legal provider holds an investment or ownership interest in a business primarily engaged in the practice of law, knowing that a nonlawyer holds an investment or ownership interest in the business;
>
> (c) A nonlawyer knowingly holds an investment or ownership interest in a business primarily engaged in the practice of law;
>
> (d) A legal provider works for a business that is primarily engaged in the practice of law, knowing that a nonlawyer holds an investment or ownership interest in the business; or
>
> (e) A nonlawyer shares legal fees with a legal provider.

RCW 2.48.180(2). The only part of this statute directly relevant to Yishmael's case is subsection .180(2)(a)'s provision that defines "unlawful practice of law" as "[a] nonlawyer practices law." Clerk's Papers (CP) at 154 (charging Yishmael with unlawful practice of law in violation of RCW 2.48.180(2)(a)), 553 (jury instruction not mentioning holding oneself forth as a lawyer); 9 VRP at 893 (prohibiting parties from arguing about whether Yishmael had held himself forth as a lawyer in their closing statements).

The plain language indicates that the legislature intended to include a mental element, even though it does not expressly include one. It is difficult to see how someone can "practice[ ] law" without *some* mental state. Professional activities are deliberate and considered; it is for that very reason that one must have a license to undertake them properly. Had the legislature meant to criminalize any action that happened to result in giving legal advice, it would have crafted the statute differently. But the legislature did not criminalize "giving legal advice" without a license; it criminalized "practic[ing] law" without a license. That distinction shows that a mental element is required.

5

The majority interprets the plain language differently. It notes that "[t]hree of these subsections contain an intent element"[2] while "[t]wo, including the one relevant here, do not." Majority at 8. The majority takes this as "evidence that the legislature intended to make [this crime] a strict liability offense." *Id.* But "a statute's silence on a mental element is not dispositive of legislative intent" to create a strict liability crime. *Bash*, 130 Wn.2d at 605; *see also Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 2009, 192 L. Ed. 2d 1 (2015) ("'[M]ere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it.'" (quoting *Morissette*, 342 U.S. at 250)). Indeed, the inclusion of a knowledge requirement in other subsections does *not* mean that the legislature intended subsection .180(2)(a) to lack a mens rea element. *See Elonis*, 135 S. Ct. at 2008, 2012-13 (reading a mental element into a subsection of a statute when that subsection was silent but the neighboring subsections had express mental elements); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69-70, 78, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994) (reading a knowledge requirement into a statute even when the "most grammatical reading of the statute" would not include a knowledge requirement). The majority's conclusion that plain language favors strict liability is incorrect. In any event, as the majority admits, more is needed to resolve this question. I therefore turn to the *Bash* factors.

---

[2] Although "intent" and "knowledge" are both different types of mental elements, *see* RCW 9A.08.010, many cases, as well as the majority, use the term "intent element" to refer to what this opinion refers to as "mental element" or "mens rea." I use "intent element" as a replacement for "mental element" only when quoting other sources.

B. The *Bash* factors strongly disfavor strict liability

The majority also turns to the *Bash* factors to construe this statute. However, the majority ignores the animating principle behind the *Bash* factors, as they are all meant "to be read in light of the principle that offenses with no mental element are generally disfavored." *Anderson*, 141 Wn.2d at 363 (citing *Bash*, 130 Wn.2d at 606). With that in mind, it is clear that none of the *Bash* factors favor strict liability.

(1) <u>Common law</u>. The first *Bash* factor asks whether there is a conventional mens rea element in the common law for this crime. *Bash*, 130 Wn.2d at 605. This factor reflects the deeply held common law tradition against strict liability crimes. "As the state[s] codified the common law of crimes" throughout American history, "even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation." *Morissette*, 342 U.S. at 252. Removing a mental element from a common law crime "should not be" done "on judicial initiative." *Id.* at 263.

While the majority correctly notes that "[t]he common law does not speak directly" on the crime of unlawful practice of law, majority at 10, our precedent indicates that we understood this crime to include a mental element, as if it were a common law crime. Nearly a century ago, in *State v. Chamberlain*, this court approved of an information charging a defendant with unlawful practice of law; that information included the mental element of willfulness. 132 Wash. 520, 521, 524-25, 232 P. 337 (1925) (noting that "[t]he information," which included a "willfully" mental element, "exactly follows the

7

language of the statute").[3] *Chamberlain* therefore shows that when applied in the early decades of Washington's existence, it was *presumed* that the crime of unlawful practice of law inherited the common law's long-standing presumption of the existence of a mental element. *See, e.g., McNeal v. Allen*, 95 Wn.2d 265, 269, 621 P.2d 1285 (1980) (A "statute . . . in derogation of the common law[ ] must be strictly construed[,] and no intent to change that law will be found, unless it appears with clarity." (citing cases)).

(2) <u>Public welfare offense</u>. The second *Bash* factor asks "whether the crime can be characterized as a 'public welfare offense'"; if so, this factor favors strict liability. *Bash*, 130 Wn.2d at 605.

"In identifying the typical 'public welfare offense,' the nature of the thing regulated is often a crucial inquiry." *Id.* at 607. Regulations creating public welfare offenses are those "involving 'pure food and drugs, labeling, weights and measures, building, plumbing and electrical codes, fire protection, air and water pollution, sanitation, highway safety and numerous other areas.'" *Id.* (quoting *State v. Turner*, 78 Wn.2d 276, 280, 474 P.2d 91 (1970)). Public welfare offenses also involve "'potentially harmful or injurious items'" and "'dangerous or deleterious devices or products or obnoxious waste materials.'" *Id.* (quoting *Staples v. United States*, 511 U.S. 600, 607, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)).

Under this rubric, unlawful practice of law cannot be labeled a public welfare offense. Certainly it is nothing like regulations governing the use of "'potentially harmful

---

[3] The majority relies on *Chamberlain* to provide "long-standing case law" defining the practice of law but ignores *Chamberlain*'s approval of a mental element. *See* majority at 23 (citing *Chamberlain*, 132 Wash. at 524).

or injurious items.'" *Id.* (quoting *Staples*, 511 U.S. at 607). True, unlawful practice of law arguably imposes a duty—the duty to get a law license before practicing law. *See id.* (quoting *Morissette*, 342 U.S. at 255-56). But even that interpretation is questionable. Does unlawful practice of law impose a duty to obtain a law license before practicing law—or does it *prohibit* one from practicing law, *unless* one has a law license? Unlawful practice of law is likely not a public welfare offense.

The majority is therefore incorrect to conclude that this factor "strongly favors" strict liability. Majority at 11. The majority can reach this result only by emphasizing that there is "no evidence in our case law that significant penalties are exacted for unlawful practice of law"; therefore, this is a public welfare offense. *Id.* at 12. But we do *not* look to the frequency of severe penalties when determining whether the legislature crafted a public welfare offense. *See Bash*, 130 Wn.2d at 605, 608-09. Under the *Bash* factors—and unlike the public welfare offense analysis conducted in federal courts—we have separated out the severity of the punishment into its own category, one which looks to not actual but *possible* punishments. *Id.* at 608-09. Indeed, we have expressly distinguished the "severity of punishment" factor from the "public welfare offense" factor. *See Anderson*, 141 Wn.2d at 364. We have made clear that the "severity of punishment" factor can be *more important* than the "public welfare offense" factor:

> Although the Court of Appeals made passing reference here to the harshness of the penalty for second degree unlawful possession of a firearm, it concluded that this factor was of little moment in light of its characterization of the offense as a public welfare offense. In our view, the Court of Appeals placed too little emphasis on the principle that "'the greater the possible punishment, the more likely some fault is required.'"

*Id.* (quoting *Bash*, 130 Wn.2d at 608-09 (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 3.8, at 343 (1986))). The "public welfare offense" factor thus does not look into the harshness of the penalty.

(3) <u>Innocent conduct</u>. The third factor considers "the extent to which a strict liability reading of the statute would encompass seemingly entirely innocent conduct." *Bash*, 130 Wn.2d at 605. A recent United States Supreme Court case, *Rehaif v. United States*, 588 U.S. __, 139 S. Ct. 2191, 204 L. Ed. 2d 594 (2019), illustrates the application of this factor. *Rehaif* dealt with a federal gun possession statute. *Id.* at 2194. The statute made it a crime for a person to (1) possess a gun while (2) being of a certain status (in Rehaif's case being unlawfully in the United States). *Id.* The question was whether the government needed to prove the defendant had knowledge of the status element; the statute made clear he had to knowingly possess the firearm. *Id.* The Supreme Court held that the government *did* need to prove knowledge of the status element. *Id.* at 2200. In reaching this conclusion, the Supreme Court relied, in part, on the fact that including a knowledge requirement would "help[ ] to separate wrongful from innocent acts." *Id.* at 2197. The Court stated:

> Assuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent. It is therefore the defendant's *status*, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful. His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach.

*Id.* (citation omitted).

Here, this factor weighs against strict liability, because Yishmael's crime resembles Rehaif's. Both crimes include a status element—here, not being a lawyer,

and in *Rehaif*, being unlawfully in the country—without which the conduct would not be criminal. Just as Rehaif's gun ownership turned on a change in his status, so, too, could a defendant's practice of law turn on losing one's law license.[4]

While it might be very easy to prove that someone who lost their law license knew they had lost it, ease of proof does not make this factor favor strict liability. Presumably anyone who, like Rehaif, was in the United States on a student visa would have known it had expired. But that did not prevent the Supreme Court from holding that the government must prove that Rehaif knew he was in the country unlawfully. *Rehaif*, 139 S. Ct. at 2194. (In fact, Rehaif likely *did* know his status had changed: he was told by his university that his "'immigration status' would be terminated unless he transferred to a different university or left the country," but he did neither. *Id.* (internal quotation marks omitted).)

The majority concludes that this factor favors strict liability. Majority at 12-13. In so doing, it dismisses a crucial concern raised by Yishmael, one that the State sought to ameliorate; this is, in essence, the risk of criminalizing any legal advice given by a nonlawyer. Yishmael explains that "[m]aking unlawful practice of law a strict liability offense . . . could inculpate people when they explain your rights when buying a house, signing liability waivers, or having other privacy rights explained." Pet'r's Suppl. Br. at 9 (footnotes omitted). The State provided this court with a ready solution to this concern,

---

[4] The majority argues that *Rehaif* is inapplicable because Yishmael was not "charged with holding himself out as a lawyer, and his status is not at issue." Majority at 13. But the question we are tasked with answering is not whether a knowledge element matters in Yishmael's case; it is whether the crime of unlawful practice of law has a knowledge element at all. *Rehaif* therefore applies insofar as it changes our analysis of whether this crime has a knowledge element.

stating unequivocally that "GR 24, and the cases it codified, establish[es] that advising others about their legal rights and responsibilities constitutes the practice of law *only when done 'for fees or other consideration.'*" Suppl. Br. of Resp't at 14-15 (emphasis added) (quoting GR 24(a)(1)).

By ignoring not only Yishmael's arguments but also those of the State—and the text of GR 24 itself—the majority risks criminalizing hosts of innocent, harmless, and often helpful conduct. It also risks running afoul of the First Amendment. *See* Part II, *infra*.

(4) Penalty. The fourth factor considers the potential harshness of the penalty. *Bash*, 130 Wn.2d at 605. "'Other things being equal, the greater the possible punishment, the more likely some fault is required; and, conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.'" *id.* at 608-09 (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 343). This factor strongly disfavors strict liability. Although punishment for the first offense is a gross misdemeanor, subsequent violations are class C felonies. RCW 2.48.180(3)(b). "[S]ubsequent violation[s]" can be charged simultaneously with the first charge. *Id.* Class C felonies are punishable by up to five years' imprisonment, a fine of up to $10,000, or both. RCW 9A.20.021(c). This is a harsh penalty, strongly disfavoring strict liability. *Anderson*, 141 Wn.2d at 364-65 (concluding that a class C felony, with its maximum possible sentence of five years, is a harsh penalty under this factor).

This factor does more than "weigh[ ] somewhat" against strict liability, as the majority claims. Majority at 14. This factor is *more* important than the factors that the majority places in favor of strict liability. In *Anderson*, we criticized the Court of Appeals

12

for "conclud[ing] that this factor [the severity of the penalty] was of little moment in light of its characterization of the offense as a public welfare offense." 141 Wn.2d at 364. In reversing, we relied heavily on the fact that the crime was, as here, a class C felony. *Id.* at 364-65. The majority repeats the Court of Appeals' error in *Anderson*, privileging the public welfare offense factor over the harshness of the penalty factor. This factor strongly weighs against strict liability.

(5) Harm to the public. The fifth *Bash* factor concerns the seriousness of possible harm to the public. 130 Wn.2d at 605, 609. Like other factors, this factor takes into account more than the case at hand; it asks whether the crime in question poses a *general* risk of harm. *See Bash,* 130 Wn.2d at 610 (noting that "[a]nimals which attack humans are a serious problem" generally, without referencing the specifics of the case). This factor disfavors strict liability because unlawful practice of law is less harmful than other offenses that we have concluded do not pose a serious risk of harm to the public. In *Anderson*, we concluded that gun possession does not necessarily pose a significant risk of harm to the public. 141 Wn.2d at 365. Whatever the harm to the public caused by the unlawful practice of law, it is infinitesimal compared to the carnage that can result from the unlawful use of firearms. *See, e.g.,* OFFICE OF JUSTICE PROGRAMS, U.S. DEP'T OF JUSTICE, PUB. NO. 241730, FIREARM VIOLENCE, 1993-2011, at 2 (2013) [https://perma.cc/7VWV-3BG6] (revealing that when *Anderson* was decided in 2000,

13

there were 10,801 firearm homicides and 610,200 "[n]onfatal firearm victimizations" in the United States).[5]

The majority disagrees. It claims that "[v]ictims of unlicensed practice of law have faced deportation; had money misappropriated; and, as this case demonstrated, have been arrested and jailed." Majority at 15 (citing *Paniagua-Jimenez v. Gonzales*, 158 F. App'x 846, 847 (9th Cir. 2005); *Tegman v. Accident & Med. Investigations, Inc.*, 150 Wn.2d 102, 106, 75 P.3d 497 (2003)). From these three examples, the majority concludes that "[t]he harm can be significant" and therefore "[t]his weighs in favor of strict liability." *Id.*

The majority's short list of examples is insufficient. *Paniagua-Jimenez* is inapposite because that case concerned a "non-attorney representative," rather than someone engaged in the unlawful practice of law. 158 F. App'x at 847. Under 8 C.F.R. § 1292.1(a)(4), a nonlawyer "[a]ccredited representative," "[a]n individual whom EOIR [Executive Office for Immigration Review] has authorized to represent immigration clients on behalf of a recognized organization," may represent clients before immigration courts and the Board of Immigration Appeals. Nothing in *Paniagua-Jimenez* indicates that the nonattorney representative was anything other than an accredited representative under 8 C.F.R. § 1292.1(a)(4). 158 F. App'x at 847; *see also* GR 24(b)(9) (exempting from the definition of practice of law "[a]ctivities which are

---

[5] True, *Anderson* expressly concluded only that the "unwitting possession of a firearm" posed no harm to the public, 141 Wn.2d at 365, but one may unwittingly possess a firearm that is *wittingly* taken by someone else and then causes harm to the public or is accidentally discharged by a child, harming the child or a parent. Yet we concluded that risking such harms was not enough to make this factor favor strict liability. *Id.* For the sake of consistency, we should apply that result here.

preempted by Federal law"). *Paniagua-Jimenez* thus provides no evidence of harm inflicted by the unlawful practice of law on those facing down the forbidding bureaucracy of the United States' immigration system.

This leaves the majority with merely two examples: *Tegman*, 150 Wn.2d 102, and this case. But it cannot generalize from two examples that there is a serious risk of harm to the public. This factor does not favor strict liability.

(6) Difficulty in ascertaining true facts. The sixth *Bash* factor takes into account "the ease or difficulty of the defendant ascertaining the true facts." *Bash*, 130 Wn.2d at 605. This factor disfavors strict liability. Compared to ascertaining the "true facts" in other crimes—including those that are *not* strict liability crimes—it is difficult to ascertain the true facts here. Ascertaining whether one has practiced law is more difficult than ascertaining whether one has committed a crime like assault. Yet crimes like assault are not strict liability crimes. The majority incorrectly concludes that this factor favors strict liability.

(7) Burden on the prosecution and convicting the innocent minded and blameless. The seventh factor asks whether strict liability will "reliev[e] the prosecution of difficult and time-consuming proof of fault where the Legislature thinks it important to stamp out harmful conduct at all costs, 'even at the cost of convicting innocent-minded and blameless people.'" *Bash*, 130 Wn.2d at 606 (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 341-44).

This factor disfavors strict liability because it would not be overly difficult and time consuming for the State to prove a knowledge element. "Knowledge" is defined as being "aware of a fact, facts, or circumstances or result described by a statute defining

an offense; or" having information that "would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." RCW 9A.08.010(b). Thus, the State would not have to prove that Yishmael *was* aware that his actions constituted the practice of law as it claims in its briefing. Suppl. Br. of Resp't at 17-18. Rather, all the State would have to prove was that a reasonable person in the same situation, with the same information, *would have* known those actions constituted the practice of law. That is not overly difficult to prove.

Further, there is no evidence that the "the Legislature thinks it important to stamp out [the unlawful practice of law] at all costs, 'even at the cost of convicting innocent-minded and blameless people.'" *Bash*, 130 Wn.2d at 606 (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 341-44). Looking to the other definitions of "unlawful practice of law" in RCW 2.48.180(2) is instructive. These definitions, in conjunction with subsection .180(3)(a), criminalize highly specific acts, such as when "[a] nonlawyer knowingly holds an investment or ownership interest in a business primarily engaged in the practice of law." RCW 2.48.180(2)(c). This hardly demonstrates legislative intent to sweep as broadly as possible, inculpating everyone, "blameless" or not. Indeed, RCW 2.48.180(2)(c) even includes a knowledge requirement.

The majority disagrees. It refers to this factor as the "legislative calculation" factor, describing it as "whether the legislature made the calculation that the value of preventing the harmful conduct outweighs '"the cost of convicting the innocent-minded and blameless."'" Majority at 16 (quoting *Bash*, 130 Wn.2d at 606 (quoting 1 LAFAVE & SCOTT, *supra*, § 3.8, at 341-44)). But the seventh factor asks whether eliminating mens rea will "reliev[e] the prosecution of difficult and time-consuming proof of fault," *and*

16

whether the legislature had deemed that cause worthy of sweeping up innocents. *Bash*, 130 Wn.2d at 606. The majority does not argue that proving a mental element is difficult. Nor does it provide evidence that the legislature intended to "convict[ ] innocent-minded and blameless people." *Id.* Despite the majority's assertions, this factor disfavors strict liability.

(8) <u>The number of prosecutions to be expected</u>. Finally, the eighth prong concerns "the number of prosecutions to be expected." *Id.* "[G]enerally the fewer expected prosecutions, the more likely intent is required." *Anderson*, 141 Wn.2d at 365 (citing 1 LAFAVE & SCOTT, *supra*, § 3.8, at 344). The State has conceded that "unlawful practice of law is unlikely to be prosecuted" and therefore "[t]his factor weighs against strict liability." Suppl. Br. of Resp't at 19. The majority agrees. Majority at 16.

Overall, these factors clearly weigh against strict liability. Combined with the plain language, which is suggestive of a mental element, I would hold that the crime of unlawful practice of law has a knowledge element.

Yishmael argued for the inclusion of a knowledge element in the jury instructions at trial. CP at 512 (proposed jury instruction); 8 VRP at 877-79 (arguing for the inclusion of a knowledge requirement). The trial court rejected Yishmael's proposed instructions and instead used the instruction proposed by the State, which read, "[T]he defendant did unlawfully practice law." CP at 553; 8 VRP at 871-72. Additionally, the instruction defining the crime of "unlawful practice of law" also lacked any mental element: it read "[a] person commits the crime of Unlawful Practice of Law when, not being an active

17

member of the State Bar, he practices law." CP at 550.[6] Yishmael objected to this

instruction because it did not include a knowledge requirement. 9 VRP at 908. Based

on the above analysis, the trial court erred when it refused to include a knowledge

requirement in its jury instructions.

_____

[6] Yishmael's proposed to-convict instruction read in full:

> To convict the defendant of the crime of unlawful practice of law, as charged in Count 4, each of the following two elements of the crime must be proved beyond a reasonable doubt:
> (1) That between March 12, 2013 and December 1, 2014, the defendant unlawfully and knowingly practiced law, or held himself out as entitled to practice law;
> (2) That these acts occurred in the State of Washington.
> If you find from the evidence that elements (1) and (2) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of elements (1) and (2), then it will be your duty to return a verdict of not guilty.

CP at 512. The to-convict instruction used at trial, by contrast, read:

> To convict the defendant of the crime of Unlawful Practice of Law, as charged in Count 4, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That during a period of time intervening between March 12, 2013 and December 1, 2014, the defendant did unlawfully practice law;
> (2) That the defendant was not then an active member of the Washington State Bar;
> (3) That the defendant's acts were part of a common scheme or plan, a continuing course of conduct and a continuing criminal impulse;
> (4) That any of these acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count 4.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to Count 4.

CP at 553.

The trial court also included a definitional instruction, which read:

> A person commits the crime of Unlawful Practice of Law when, not being an active member of the State Bar, he practices law.

CP at 550.

Because I would hold that a knowledge element was erroneously omitted from the jury instruction of unlawful practice of law, I would reach the next question: whether the error was harmless. It is not clear beyond a reasonable doubt that the verdict would have been the same had the jury instruction included a knowledge requirement. *See State v. Nelson*, 191 Wn.2d 61, 69, 419 P.3d 410 (2018) (omission of an element is subject to harmless error analysis in which it must be clear beyond a reasonable doubt that the error complained of did not contribute to the verdict) (citing *Neder v. United States*, 527 U.S. 1, 9, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999))); *State v. Brown*, 147 Wn.2d 330, 339, 341, 58 P.3d 889 (2002) (same). The State presented no direct evidence of Yishmael's mental state, and Yishmael himself expressly denied knowing that he engaged in the practice of law. 8 VRP at 863. I would reverse and remand for a new trial on this charge. *See Brown*, 147 Wn.2d at 342 (affording the same relief).

II.     The majority risks criminalizing an extraordinary amount of innocent and harmless speech in contravention of the First Amendment

There is further reason to disagree with the majority than the above analysis. Unnecessarily, and without any request from the State, the majority impliedly expands the reach of the unlawful practice of law statute to encompass *any* advice about the law. We should avoid this result.

The majority risks criminalizing simple, innocent, and helpful caution against unlawful behavior. The majority does so by making clear that Yishmael's crime was complete when he gave legal advice without a law license irrespective of any fees charged. *See* majority at 3. Though the majority notes the fees, it appears that the majority would conclude Yishmael's actions were criminal without his charging a cent.

*See id.* at 23 ("Yishmael did not dispute that he gave his clients advice on homesteading, adverse possession, and talking with the police, and that he offered assistance in completing documents to be filed with the county recorder's office. This is sufficient to establish the charge [of unlawful practice of law].")

Criminalizing mere legal advice is an untenable result, one for which no party asked. Yet the majority could have easily avoided this result. The majority could have simply quoted the text of GR 24(a), which states that practice of law consists of, among other things, "[g]iving advice or counsel to others as to their legal rights or the legal rights or responsibilities of others *for fees or other consideration.*" (Emphasis added.) Or the majority could have relied on the State, which made this observation in its briefing. Suppl. Br. of Resp't at 14-15 (citing GR 24(a)). The majority instead provides a construction of the statute that may violate the First Amendment.

The First Amendment comes into play whenever the government regulates speech. U.S. CONST. amend. I. When the State proscribes the content of actual speech, the proper standard of review is strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. __, 135 S. Ct. 2218, 2227, 192 L. Ed. 2d 236 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Laws that are "facially content neutral[] will [also] be considered content-based regulations of speech" and subjected to strict scrutiny when they "cannot be 'justified without reference to the content of regulated speech.'" *Id.* (internal quotation marks omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). And there is no such separate category, such as "professional speech," that would lead to less-strict scrutiny of

20

regulations like the one at here at issue. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. __, 138 S. Ct. 2361, 2371-72, 201 L. Ed. 2d 835 (2018) (noting that regulations of the content of professional speech are, like all such speech regulations, subject to strict scrutiny). A law subject to strict scrutiny must "'further[ ] a compelling interest and [be] narrowly tailored to achieve that interest.'" *Reed*, 135 S. Ct. at 2231 (internal quotation marks omitted) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011)).

As construed by the majority, the law at issue implicates the First Amendment. Advice is speech. The law is also not content neutral: it targets *advice about the law*. The majority's construction of the statute therefore trips headlong into strict scrutiny. While there may be a compelling governmental interest—protecting citizens from the harm resulting from following false legal advice from nonlawyers—it is not narrowly tailored. The majority's construction instead takes what would potentially be a narrowly tailored means of protecting the public—prohibiting nonlawyers from taking payment for giving legal advice—and opens it up to potentially criminalizing *any* legal advice *ever* given by *anyone* who lacks a law license. Such a law would almost certainly be overbroad, allowing even those whose speech can constitutionally be proscribed to mount a challenge to the law. *See New York v. Ferber*, 458 U.S. 747, 768-69, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982) (discussing overbreadth challenges under the First Amendment).

Nothing indicates that the legislature intended to criminalize speech in this manner. Were there a question that the legislature did intend to reach speech in this way, we should *avoid* such an interpretation, as "[w]herever possible, it is the duty of

this court to construe a statute so as to *uphold* its constitutionality." *State v. Reyes*, 104 Wn.2d 35, 41, 700 P.2d 1155 (1985) (emphasis added) (citing *Anderson v. Morris*, 87 Wn.2d 706, 716, 558 P.2d 155 (1976)). We should not interpret a statute in a manner that could transform it into an unconstitutional restriction on free speech.

The potential consequences are severe. Under the majority's interpretation of the law, someone could be prosecuted for merely advising another to refrain from parking illegally—after all, is that not also legal advice? While I trust law enforcement agencies of this state to refrain from such pointless and harmful prosecutions, we should nevertheless avoid this possibility.

True, the majority has made no such express holding regarding the scope of this law. Nor has the State begun prosecuting people for merely giving advice. Yishmael did not raise these arguments on appeal. Thus, as the majority points out, the First Amendment is not directly at issue in this appeal. Majority at 24 n.4. However, we should not precipitate a constitutional confrontation that a few words could avoid.

## CONCLUSION

I would hold the crime of unlawful practice of law requires proof of knowledge as Yishmael argues. The trial court erred by refusing to include this element in its jury instructions. We should therefore reverse and remand to the trial court for a new trial on this charge because this error was not harmless. We should not broaden the reach of this statute beyond the legislature's intent and stretch it to encompass constitutionally protected speech. We should instead carefully cabin the reach of the law to the legislature's intent.

I respectfully dissent.

Wiggins, J.

Geo McEd, J.

Madsen, J.