Filed
Washington State
Court of Appeals
Division Two

December 8, 2020

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52594-1-II |
| Respondent, | |
| v. | |
| GABRIEL AUGUSTO GARCIA, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Gabriel Augusto Garcia appeals his conviction for attempted first degree rape of a child arising from an undercover operation conducted by the Washington State Patrol Missing and Exploited Children's Task Force. Garcia contends the evidence was insufficient to support the conviction. He also argues that the trial court did not follow CrR 3.2's presumption of pretrial release without conditions, the State's conditional plea offer violated his due process rights, and the trial court erred by denying his motion to dismiss for outrageous governmental misconduct. Finally, Garcia claims his sentencing range was incorrect and resentencing is required.

We hold that sufficient evidence supported Garcia's attempted first degree rape of a child conviction. We also hold that Garcia's pretrial release argument is moot, the conditional plea offer did not violate Garcia's due process rights, and, under *State v. Glant*,[1] the trial court properly denied Garcia's motion to dismiss for outrageous governmental misconduct. Garcia was properly

---

[1] *State v. Glant*, 13 Wn. App. 2d 356, 465 P.3d 382, *review denied*, __ Wn.2d ___, 474 P.3d 1055 (2020).

sentenced to the low end of the correct standard range. We affirm Garcia's conviction and sentence but remand for the trial court to correct scrivener's errors in the judgment and sentence.

FACTS

A.      Washington State Patrol Missing and Exploited Children's Task Force

The Washington State Patrol Missing and Exploited Children's Task Force investigates sex crimes against children. RCW 13.60.110. Task force investigations involving the Internet are dubbed "Net Nanny" operations. *Glant*, 13 Wn. App. 2d at 360. In 2016, Sergeant Carlos Rodriguez managed the task force and oversaw its operations. *Id.*

RCW 13.60.110(4) provides, "The chief of the state patrol shall seek public and private grants and gifts to support the work of the task force." The task force receives donations from private citizens and organizations, including from Operation Underground Railroad (O.U.R.). *Glant*, 13 Wn. App. 2d at 360. The state patrol issued a press release following each Net Nanny operation. *Id.* Some press releases acknowledged O.U.R.'s support. *Id.* E-mails show that Rodriguez coordinated financial donations from O.U.R and collected overtime pay while conducting Net Nanny operations. *Id.* at 361.

B.      Facts Leading to Garcia's Conviction

In September 2016, the task force conducted a Net Nanny operation in Thurston County, Washington. *Id.* The task force posted an advertisement on the casual encounters section of Craigslist stating, "'Family Playtime!?!?-W4M.' . . . Mommy/daughter, daddy/daughter, daddy/son, mommy/son, you get the drift. You know what I'm talking about. Hit me up. We will chat more about what I have to offer you." Verbatim Report of Proceedings (VRP) (June 20, 2018)

at 198-99.[2] Garcia responded to the advertisement by e-mail, saying he was "very interested." VRP (June 19, 2018) at 93. Undercover Washington State Patrol Detective Kristl Pohl responded by e-mail, posing as "Hannah," a mother of young children. VRP (June 19, 2018) at 107. Hannah[3] said she wanted her children to learn about sex from an adult man, like she had from her father. Hannah gave Garcia her phone number and they switched to texting.

Garcia asked Hannah about the ages of her children, and she told him that her daughters were 11 and 6 years old and her son was 13 years old. Garcia asked Hannah to tell him more about her "sexual education growing up with [her father]" and whether her 11-year-old daughter, "Anna," would be "open to the same experience." Clerk's Papers (CP) at 176. Garcia said he could teach Anna "how a[n] old grow[n] man can touch her," he could teach her how to perform oral sex, and he wrote, "I can be [the] first man inside her." CP at 178. Garcia asked Hannah, "Would you like me [to] take your daughter's virginity?" CP at 183. Garcia said he could not get Anna pregnant but offered to wear a condom and bring green apple flavored lubricant.

Garcia asked Hannah if he could have sex with her, too. Hannah said she would not have sex with Garcia but they could be "besties." CP at 182. Garcia wrote back, "That's not a problem at least I hope [I] can have sex with Anna." CP at 182. Garcia told Hannah he wanted to "create a bond" with Anna so she felt "safe, protected, loved, and not just used." CP at 214. He wanted "more than occasional sex." CP at 212. Garcia talked about finding a house where Hannah and her children could live together with him and "keep our secret safe." CP at 180. Garcia told Hannah he wanted to move forward slowly to ensure Anna enjoyed having sex with him the first time so

---

[2] "W4M" means "women for men." VRP (June 20, 2018) at 198.

[3] We use the law enforcement officer's undercover persona for clarity.

they could "[repeat] the experience." CP at 180. Garcia also texted with a person he believed to be 11-year-old Anna, also portrayed by Pohl. Garcia graphically described sex acts he wanted to perform with her, including oral sex.

Garcia asked Hannah if they could "meet in a public place first?" CP at 196. Hannah told him she had "a system" to keep herself safe that required meeting privately at her apartment. CP at 197. She stated, "[I]f you can[']t do that [I] understand and [I']ll move on." CP at 197. Garcia agreed to her system, noting, "I'm just nervous [because] I don't want a set up but let's do it your way . . . I hope your way can be safe for me [because it] is my freedom [laugh out loud (lol)]." CP at 197.

Garcia recognized that sex with a child was illegal and wrote to Hannah that he was worried about going to jail as a sex offender. After three days of texting, Garcia still had not made plans to go to Hannah's house, so Hannah told him she had contacted another man who might come over the next night. Hannah questioned whether Garcia was the right man for Anna since all he had done so far was talk. Garcia made plans to meet Anna the next day.

On the day of the planned meeting, Garcia texted, "Just to let you know and for the record I'm not expecting to have sex with Anna. . . . That's why I'm not going to take any condoms with me that way I think we all are going to be a little more relax[ed]. What [do] you think?" CP at 220. Hannah told Garcia that Anna expected to have sex with him. Garcia responded, "If [Anna] want[s] to lose her virginity I can help her." CP at 221. Hannah followed up, "[D]on[']t come here if you[']re not ready. [I] don't want [A]nna disappointed." CP at 222. Garcia assured Hannah, "I know what I want. I'm just nervous [because of] the circumstances of our meeting lol." CP at 223. He followed up with two additional texts saying he was excited and ready for a sexual encounter

4

with Anna. Hannah reminded him to bring the green apple flavored lubricant. Garcia said he would bring it if he remembered.

Garcia lived with relatives on Joint Base Lewis-McCord. Shortly before leaving to meet Hannah and her children, Garcia texted, "This is just for legal [purpose]: anything in this chat can't be used [in] court without my express permission. I'm not planning to do anything illegal during this visit. This is only to meet a future roommate and her family. Nothing else is expected." CP at 224. Minutes later, Garcia wrote, "Don't worry that is to protect us [in case] this [is] used in the wrong hands." CP at 224.

Following Hannah's instructions, Garcia went to a mini-mart and sent a selfie. Hannah then gave him an address at an apartment complex. Garcia entered the address into his GPS. A state patrol trooper who was waiting at the apartment complex saw Garcia pull into the complex parking lot. The trooper stopped Garcia, arrested him, and searched Garcia and the vehicle, finding a bottle of lubricant and a sex toy. The trooper testified he found both items in Garcia's pocket.

Garcia was charged with attempted first degree rape of a child under RCW 9A.44.073 and RCW 9A.28.020 and communication with a minor for immoral purposes using electronic means under RCW 9.68A.020 and RCW 9.68A.090(2).

At a preliminary hearing in 2016, the Thurston County Superior Court set bail at $100,000, finding Garcia a flight risk because he had only recently moved to Washington a few days before his arrest and thus did not have substantial ties to the community. The trial court also relied on the nature and seriousness of the allegations. The trial court later denied a defense motion to reduce the bail amount to $50,000, finding no change in circumstances.

The State offered Garcia a plea deal conditioned on Garcia pleading guilty before defense counsel interviewed law enforcement. At least some pretrial discovery had been given to Garcia at the time of the plea offer. Garcia did not take the plea offer, and the trial court granted Garcia's motion to continue the trial date so he could conduct an investigation.

C.       Motion to Dismiss

In March 2018, Garcia filed a pretrial motion to dismiss, arguing that the task force engaged in outrageous governmental misconduct while carrying out the undercover operation that led to his arrest. Garcia incorporated a motion to dismiss filed by a defendant in a similar case, Bryan Glant, who responded to the same Craigslist advertisement and was also charged with attempted first degree rape of a child.[4] *Glant*, 13 Wn. App. 2d at 369-75.

Garcia adopted Glant's arguments alleging that the relationship between O.U.R. and the task force constituted outrageous governmental misconduct. Garcia also argued that his specific interactions with the undercover officers constituted outrageous government conduct. Garcia asserted that he had only wanted a relationship with an adult woman, but Hannah steered the conversation toward sex with children and coerced him into responding. Garcia claimed he had no idea who he was really conversing with and he never thought real children were involved.

The trial court denied the joint motions to dismiss, finding that they involved two main issues: (1) misconduct in the task force's acquisition of private funding for the undercover operation and (2) the nature of the interactions between the undercover officers and the specific defendants. The trial court applied the five factors for assessing outrageous governmental

---

[4] Two other defendants who were arrested during the same Net Nanny operation also filed motions to dismiss. The trial court heard oral argument on all four motions at one hearing.

misconduct under *State v. Lively*, 130 Wn.2d 1, 22, 921 P.2d 1035 (1996), and concluded that the task force did not engage in outrageous governmental misconduct through its relationship with O.U.R or in its specific interactions with the defendants.

D.      Sentencing

In June 2018, a jury convicted Garcia of attempted first degree rape of a child under RCW 9A.44.073 and RCW 9A.28.020 (count one) and felony communication with a minor for immoral purposes under RCW 9.68A.090(2) (count two).

Under RCW 9.68A.090(2), communication with a minor for unlawful purposes is a felony if the communication occurred electronically. Garcia communicated with Anna electronically and was charged and convicted under the felony provision. The State's presentence investigation, however, did not include that felony conviction in Garcia's offender score for count one. The State later clarified at the sentencing hearing that it was recommending a standard range sentence for count one based on an offender score that *did* include Garcia's felony conviction for count two.[5] The parties and the trial court agreed that the conviction for count two would count toward Garcia's offender score for count one and the correct minimum range for count one was 90-120 months, with a maximum of life. The trial court imposed a sentence of 90 months to life for count one.

Despite the conversation at the sentencing hearing, Garcia's offender score for count one was listed as zero and his offender score for count two was listed as "N/A" in his judgment and sentence. CP at 348. Although the judgment and sentence correctly lists the standard range for count one as 90-120 months to life and Garcia was properly sentenced to 90 months to life, the

---

[5] The State explained at the sentencing hearing that its presentence investigation mistakenly considered Garcia's conviction for communication with a minor for immoral purposes a gross misdemeanor under RCW 9.68A.090(1) instead of as a class C felony under RCW 9.68A.090(2).

judgment and sentence contains scrivener's errors with regard to Garcia's offender scores for both counts.

Garcia appeals his conviction and sentence for attempted first degree rape of a child.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Garcia argues that the evidence was insufficient to convict him of attempted first degree rape of a child because it did not show that he intended to have sex with Anna the day of his arrest, and it did not show that he took a substantial step toward committing that crime. We disagree.

A.      Attempted First Degree Rape of a Child and Sufficiency of the Evidence Standard

Under RCW 9A.44.073(1), a defendant may be convicted of first degree rape of a child if the State proves that they had sexual intercourse with a child who was younger than 12 years old, not married to the defendant, and at least 24 months younger than the defendant. Under RCW 9A.28.020(1), a defendant can be convicted of "an attempt to commit a crime if, with intent to commit a specific crime, [the defendant] does any act which is a substantial step toward the commission of that crime." If "the conduct in which a person engages otherwise constitutes an attempt to commit a crime," it is no defense that the attempt crime that was charged was "factually or legally impossible." RCW 9A.28.020(2).

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Yishmael*, 195 Wn.2d 155, 177, 456 P.3d 1172 (2020). Appellate courts draw all reasonable inferences in favor of the State and assume the truth of the State's evidence. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019), *cert. denied*, *Scanlan*

*v. Washington*, _ U.S. _, 140 S. Ct. 834, _ L. Ed. 2d _ (2020). This court cannot review the trier of fact's credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). "Direct and circumstantial evidence are equally reliable in determining the sufficiency of the evidence." *State v. Dillon*, 12 Wn. App. 2d 133, 140, 456 P.3d 1199, *review denied*, 195 Wn.2d 1022 (2020).

B.      Sufficiency of the Evidence to Convict Garcia of Attempted First Degree Rape of a Child

The to convict instruction provided that the State had to prove that Garcia "attempted to have sexual intercourse with a minor child." CP at 294. The to convict instruction required the State to prove that Garcia took a "substantial step toward the commission of rape of a child in the first degree" and "[t]hat the act was done with the intent to commit rape of a child in the first degree." CP at 294. The act had to occur in Washington and the minor child had to be less than 12 years old, not married to the defendant, and at least 24 months younger then the defendant. Garcia does not dispute that the evidence was sufficient to prove the age, lack of marriage, or jurisdictional elements of the offense.

1.      Intent

Garcia argues that a jury could not have found intent because his actions did not show intent to engage in "sexual activity on the day he drove toward the trap house." Br. of Appellant-Corrected at 17. Additionally, Garcia claims that his sexually explicit texts and e-mails alone were insufficient to establish intent.

"Criminal intent may be inferred from all the facts and circumstances surrounding the commission of an act." *State v. Brooks*, 107 Wn. App. 925, 929, 29 P.3d 45 (2001). Although "'conduct that is patently equivocal'" does not support an inference of intent, "'it may be inferred

from conduct that plainly indicates such intent as a matter of logical probability.'" *Id.* (quoting *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)).

In other attempted rape of a child cases, evidence that a defendant sent sexually explicit messages to a child and made plans to have sex or expressed intent to have sex with a child supported findings of intent. In *State v. Wilson*, Division One held that the evidence established intent where the defendant e-mailed with an undercover officer posing as a 13-year-old girl and arranged to have sex with her. 158 Wn. App. 305, 317-18, 242 P.3d 19 (2010). In *State v. Sivins*, Division Three held that the evidence supported intent where the defendant "engaged in sexually graphic Internet communications with a police intern he believed to be a 13-year-old girl," told the girl he would have sex with her if she wanted to, and "enticed her with promises of vodka and pizza." 138 Wn. App. 52, 64, 155 P.3d 982 (2007). The court concluded, "These communications reveal[ed] [Sivins's] intent to engage in sexual intercourse with a 13-year-old girl." *Id.*

Here, Garcia wrote numerous texts to Hannah and Anna over the course of several days repeatedly describing his plans to have sex with 11-year-old Anna. We reject Garcia's reliance on his occasional hesitation to have sex with Anna and his argument that he did not intend to have sex with a child *on the day he was arrested*. Garcia identifies no law restricting the length of time between the substantial step and expression of intent to commit the specific crime. And on the same day he was arrested, Garcia texted Hannah saying, "If [Anna] want[s] to lose her virginity[,] I can help her." CP at 221. Just before Garcia left to meet Anna, Hannah reiterated that Anna expected to have sex with him. Garcia wrote, "I know what I want. I'm just nervous [because of] the circumstances of our meeting lol." CP at 223. He also said he was excited and ready for a sexual encounter with Anna. Although Garcia sent a text stating that he was "not planning to do

anything illegal during this visit," he immediately clarified that the statement was designed only to protect them in case the messages ended up in the "wrong hands." CP at 224. When searching Garcia upon arrest, the trooper found the lubricant Hannah told him to bring.

As in *Sivins*, Garcia sent sexually explicit text messages describing plans to have sex with a child and then drove to the town where Hannah and Anna lived. As in *Wilson*, Garcia followed Hannah's instructions by driving to the mini-mart and sending a selfie. Although some of Garcia's text messages were contradictory and Garcia testified that he never intended to have sex with an actual child, we cannot reweigh jury determinations about credibility or resolve conflicting evidence. *See Camarillo*, 115 Wn.2d at 71. Drawing all inferences in favor of the State, a rational fact finder could have concluded that the State proved the necessary intent beyond a reasonable doubt given the content of Garcia's text messages and his decision to drive to the apartment complex where he believed the child was located. *See Yishmael*, 195 Wn.2d at 177.[6]

2.      Substantial step

Garcia argues that he did not take a substantial step because he did not park his car and walk up to Hannah's door. Garcia argues the evidence showed mere preparation, which does not amount to a substantial step.

A substantial step is an action strongly corroborative of the defendant's criminal purpose. *State v. Johnson*, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). "Mere preparation to commit a crime is not an attempt." *State v. Wilson*, 1 Wn. App. 2d 73, 83, 404 P.3d 76 (2017). "But '[a]ny slight

---

[6] Garcia contrasts his case with *State v. Townsend*, 147 Wn.2d 666, 680, 57 P.3d 255 (2002), but *Townsend'*s holding supports our conclusion. In *Townsend*, the Washington Supreme Court held that electronic communications can be sufficient to show intent to have sex with a child, even if the defendant was unknowingly communicating with law enforcement rather than a real child. *Id*.

act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime.'" *Id.* (alteration in original) (quoting *State v. Price*, 103 Wn. App. 845, 852 14 P.3d 841 (2000)).

In *Wilson*, the defendant took a substantial step by driving to the arranged meeting place, where he "sat in his car and waited in the parking lot for approximately 30 minutes." 158 Wn. App. at 317-18. The defendant also brought $300 with him—the exact amount he had promised to pay for sex with the child—which corroborated his intent to have sex with the child. *Id.* In *Sivins*, the defendant drove five hours to the town where he thought the child was located and rented a motel room. 138 Wn. App. at 64. Sivins argued that he had not taken a substantial step because "he told [the fictitious child] that sexual intercourse was contingent upon getting to know each other," and "[i]t may have been [his] intent to eventually reach that point in time; but that point . . . had not arrived" when he was arrested. *Id*. The court rejected this argument, holding that driving five hours and renting a motel room "were substantial steps that strongly corroborate[d]" Sivins's intent to have sex with a child. *Id.*

Here, the text messages Garcia sent before leaving on the day of his arrest reflected an intent to have sex with Anna that day. Garcia also followed Hannah's instructions to send a selfie from the mini-mart, waited for Hannah to send him her address, entered the address into his GPS, and drove to the apartment complex where Hannah said she lived, bringing the flavored lubricant she told him to bring and a sex toy. As in *Wilson*, these "actions . . . strongly corroborated [the defendant's] intent to commit the crime." 158 Wn. App. at 318. Garcia did not need to go to the door of the apartment because even a "'slight act done in furtherance of a crime constitutes an

attempt if it clearly shows the design of the individual to commit the crime.'" *Sivins*, 138 Wn. App. at 64 (quoting *Price*, 103 Wn. App. at 852).[7]

Drawing all inferences in favor of the State, we hold that the evidence was sufficient to support a conviction for attempted first degree rape of a child.

## II. PRETRIAL ISSUES

A.      Pretrial Release Under CrR 3.2

Garcia argues that the trial court abused its discretion when it set bail at $100,000 and denied his motion to reduce the bail amount. He contends that the trial court erred by failing to properly apply CrR 3.2(c) to assess whether pretrial release would reasonably ensure Garcia's appearance. In addition, Garcia argues that the trial court erred by imposing monetary bail without considering whether a less restrictive alternative could ensure the safety of the community and without considering Garcia's financial resources. Garcia acknowledges that this issue is now moot but argues that we should consider it anyway because it is a matter of continuing and substantial public interest. We disagree.

An issue is moot if the court can no longer provide effective relief. *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). Here, we cannot provide effective relief postconviction, even if bail were set improperly. But we may address a moot issue "if it involves matters of continuing and substantial public interest." *State v. Hunley*, 175 Wn.2d 901, 907, 287 P.3d 584

---

[7] Garcia also suggests the evidence was insufficient to support a finding that he took a substantial step because a U.S. Army special agent wrote a report about Garcia's arrest and decided not to investigate further. The record does not reflect that this report was ever admitted as evidence at trial, and the report is not relevant to this court's determination of whether the evidence was sufficient to convict Garcia of attempted first degree rape of a child, viewing the evidence in the light most favorable to the State.

(2012). "In determining whether a case presents an issue of continuing and substantial public interest, we consider (1) the public or private nature of the issue, (2) whether guidance for public officers on the issue is desirable, and (3) the likelihood that the issue will recur." *State v. Ingram*, 9 Wn. App. 2d 482, 490, 447 P.3d 192 (2019), *review denied*, 194 Wn.2d 1024 (2020). We also assess "'the likelihood that the issue will escape review because the facts of the controversy are short-lived.'" *State v. Huckins*, 5 Wn. App. 2d 457, 463, 426 P.3d 797 (2018) (internal quotation marks omitted) (quoting *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994)).

Garcia's CrR 3.2 arguments have all been addressed recently by this court in *Huckins*, 5 Wn. App. 2d at 467-68, and *Ingram*, 9 Wn. App. 2d at 493-96. Although the trial court did not have the benefit of these recent cases at Garcia's bail hearing in 2016, Garcia's arguments do not present matters of continuing and substantial public interest for this court because *Huckins* and *Ingram* have provided recent guidance. We decline to further review Garcia's CrR 3.2 arguments.

B.      Conditional Plea Offer

Garcia argues that the State violated his due process rights because the State conditioned its plea offer on his counsel not interviewing the law enforcement officers. Garcia emphasizes that the constitutional right to effective assistance of counsel applies at the plea bargaining stage and requires that counsel be able to investigate the case and advise the client whether or not to plead guilty. But notably, Garcia does not claim that his own counsel performed deficiently in any way. We conclude that the State's conditional plea offer did not deprive Garcia of his right to counsel, nor did the conditions violate due process.

"[P]rosecutors have broad discretion whether to charge a crime or enter into plea bargaining." *State v. Moen*, 150 Wn.2d 221, 227, 76 P.3d 721 (2003). "However that discretion is

14

not 'unfettered.'" The State may not exercise discretionary authority "in a manner that constitutes a violation of due process rights." *Id.* But the "theoretical basis for all plea bargaining is that defendants will agree to waive their constitutional rights." *Id.* at 231. So if the State insists on a condition that requires a defendant to give up a constitutional right, doing so, by itself, does not violate due process. *Id.* at 230. In *Moen*, the State conditioned its plea bargain on the defendant not compelling disclosure of the identity of a confidential informant, and the Washington Supreme Court held that the State's condition did not violate Moen's due process rights. *Id.* at 224, 230.

Here, the State's plea offer was contingent on defense counsel not interviewing the law enforcement officers. As in *Moen*, the State's plea condition limited Garcia's ability to investigate the case, but that, by itself, did not violate due process.

C.      Governmental Misconduct

Garcia argues that the trial court erred by concluding that the state patrol's method of fundraising, the task force's receipt of private funding and O.U.R.'s involvement in the Net Nanny operation, did not amount to outrageous governmental misconduct. Garcia also asserts that the trial court erred by concluding that the undercover officers' specific interactions with him did not constitute outrageous governmental misconduct. We disagree.

In *Glant*, we recently affirmed the trial court's denial of a motion to dismiss for outrageous governmental misconduct based on the same Net Nanny operation. 13 Wn. App. 2d at 369. We affirmed that the task force's receipt of private funding was proper and agreed that there was no direct link between the task force's receipt of private funding and Glant's arrest. *Id.* at 371. We rejected the argument that only the state patrol chief could solicit funding for the task force. *Id.* at

374-75. We also held that the trial court properly applied the *Lively* factors and found that no outrageous governmental misconduct occurred. *Id*. at 372-74.

1.      Government misconduct standard

Law enforcement conduct may be "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *Lively*, 130 Wn.2d at 19 (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). "Government conduct is outrageous and violates due process only when the conduct is so shocking that it violates fundamental fairness." *Glant*, 13 Wn. App. 2d at 370. "Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity." *Lively*, 130 Wn.2d at 20. Proper law enforcement objectives—preventing crime and apprehending violators rather than encouraging or participating in sheer lawlessness—must drive law enforcement conduct, but dismissal for outrageous governmental misconduct is reserved for egregious circumstances. *Id.* at 20.

In determining whether government conduct violated due process, the trial court must assess the conduct in relation to the totality of the circumstances. *See Glant*, 13 Wn. App. 2d at 371. Courts consider several factors, including (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity;" (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation;" (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur;" (4) "whether the police motive was to prevent crime or protect the public;" and (5) "whether the government conduct itself amounted to criminal activity or conduct

'repugnant to a sense of justice.'" *Lively*, 130 Wn.2d at 22 (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978)).

We review whether the trial court erred in denying a motion to dismiss based on outrageous government misconduct for an abuse of discretion. *State v. Athan*, 160 Wn.2d 354, 375-76, 158 P.3d 27 (2007). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.*

  2.  <u>Acquisition of private funding</u>

Garcia argues the trial court wrongly concluded that no government misconduct arose from the task force's acquisition of private funding. Garcia argues that Rodriguez was not statutorily authorized to solicit donations and grants for the task force because only the state patrol chief could do so. Garcia also argues the trial court "erred when it found no 'direct link' between [the task force's] receipt of funds from [O.U.R.] and the investigation." Br. of Appellant-Corrected at 28.

In *Glant*, we rejected the argument that "Rodriguez violated RCW 13.60.110 because the delegation of funding duties was improper." 13 Wn. App. 2d at 374. RCW 13.60.110(4) states, "The chief of the state patrol shall seek public and private grants and gifts to support the work of the task force," and RCW 13.60.110(3) provides, "The chief of the state patrol may employ such additional personnel as are necessary for the work of the task force." Accordingly, the state patrol chief is not the only person who can carry out the duties in the statute and the delegation of fundraising duties was proper. *See id.* at 374-75; RCW 13.60.110(3)-(4). We also rejected Glant's contention "that [the task force's] relationship with O.U.R. . . . prevented law enforcement officers from protecting the public," noting, "RCW 13.60.110 specifically allows for private funding . . . . Simply because private supporters help to fund a program does not mean that that program no

longer aims to protect the public or prevent crime." *Glant*, 13 Wn. App. 2d at 374-75. Following *Glant*, we affirm the trial court's conclusion that Rodriguez's solicitation of private funding and the relationship between O.U.R. and the task force did not constitute outrageous governmental misconduct.

 3. Interactions between Garcia and undercover officers

Garcia argues that the trial court erred by concluding that law enforcement's interactions with Garcia did not constitute outrageous governmental misconduct. Like the defendant in *Glant*, Garcia contests each of the trial court's conclusions about the *Lively* factors. We reject his argument.

Garcia's arguments about the first and fifth *Lively* factors, whether the police instigated or committed crimes, entirely replicated *Glant's* arguments about the nature of the Net Nanny operation generally, the task force's receipt of private funding, and the relationship between O.U.R. and the task force. Following *Glant*, we conclude that the trial court did not err in its conclusions about the first and fifth *Lively* factors. *Id.* at 371-76.

With regard to the second *Lively* factor, whether law enforcement used "persistent pleas of sympathy, promise of excessive profits, or persistent solicitation" to overcome any reluctance on Garcia's part to commit a crime, the trial court concluded that this factor weighed in the State's favor. CP at 247. The trial court noted that Garcia had "varying degrees of reluctance in the messages back and forth with the undercover officer," but under the "totality of the circumstances" law enforcement did not induce Garcia to commit a crime by pleas or solicitation. CP at 247.

Garcia argues that Hannah pressured him into meeting at her apartment even though he preferred to meet somewhere public and he tried to back out, but Hannah pressured him by saying "he was 'all talk.'" Br. of Appellant-Corrected at 31. Garcia, however, initiated the conversation by responding to the Craigslist advertisement, inquired about the ages of Hannah's children, expressed his interest in sexual contact with the 11-year-old daughter, volunteered to "be [the] first man inside [Anna]," and stated on the day he drove to meet Hannah and Anna that he would help Anna "lose her virginity." CP at 178, 221. Garcia also did not hesitate to express his interest in sex with Anna when he texted with her directly. Garcia followed Hannah's instructions for the meeting. We hold that the trial court did not err when it concluded that the second *Lively* factor weighed in favor of the State.

The trial court held that the third *Lively* factor, whether law enforcement controlled the criminal activity or simply allowed it to occur, was "neutral" because "the record [was] devoid of information regarding the landscape of Craigslist at the time of the 'Net Nanny' operation." CP at 248. Garcia argues that the Craigslist advertisement "could easily have been read to have meant a woman who wanted to role play with a male during a casual sexual encounter," but the undercover officers controlled the criminal activity by giving the ages of the children to "trigger the child rape in the first[]degree statute." Br. of Appellant-Corrected at 32. But it was Garcia who asked Hannah how many children she had and what their ages were. Garcia said he wanted to have sex with Anna only after Hannah told him that Anna was 11 years old. Garcia offered no evidence that law enforcement controlled the criminal conduct. We hold that the trial court did not err by deciding that the third *Lively* factor was neutral.

19

The trial court found that the fourth *Lively* factor, whether law enforcement's motive was to prevent crime or protect the public and not simply to create crimes to prosecute, "strongly favor[ed] the State" because the task force's motivation was to protect the public. CP at 248. Garcia argues that the task force's motive could not have been to protect the public because he "had no criminal history, and the State presented no evidence that [he] was involved in child pornography or any crimes against real children." Br. of Appellant-Corrected at 32. But under *Lively*, "In evaluating whether the State's conduct violated due process, [courts] focus on the State's behavior and not the [d]efendant's predisposition." 130 Wn.2d at 22. The task force's purpose is to promote the safety of missing and exploited children. RCW 13.60.100. Garcia's predisposition to commit crimes against children was not relevant to law enforcement's motive in carrying out the Net Nanny operations. The trial court properly concluded that the fourth *Lively* factor favored the State.

We hold that the trial court did not abuse its discretion by concluding that, under the totality of the circumstances, no outrageous governmental misconduct occurred.

## III. SENTENCING

Garcia argues that the trial court erred by imposing a sentence of 90 months to life because he claims the court improperly calculated the sentence range for a person convicted of a criminal attempt under RCW 9.94A.595. Garcia asks that we remand for resentencing. We disagree and decline.

Under RCW 9.94A.595, "For persons convicted of the anticipatory offenses," including criminal attempt, "the presumptive sentence is determined by locating the sentencing grid sentence range defined by the appropriate offender score and the seriousness level of the crime, and multiplying the range by 75 percent."

20

Garcia had an offender score of three points for each offense because he was convicted of attempted first degree rape of a child and felony communication with a minor for immoral purposes and had no other criminal history. RCW 9.94A.589(1)(a), .525(17). First degree rape of a child has a seriousness level of XII. RCW 9.94A.515. The standard minimum sentence range for first degree rape of a child for a person with an offender score of three points would be 120-160 months. RCW 9.94A.510. Thus under RCW 9.94A.595, the standard minimum sentence range for Garcia's attempted first degree rape of a child conviction was 90-120 months. Garcia was properly sentenced to 90 months to life on count one, the low end of the correct range for attempted first degree rape of a child. We reject Garcia's request for resentencing.

The State concedes the judgment and sentence contains scrivener's errors improperly listing Garcia's offender scores for count one as zero and count two as "N/A." Br. of Resp't at 45-46; CP at 348; Wash. Court of Appeals oral argument, *State v. Garcia*, No. 52594-1-II (Sept. 4, 2020), at 26 min., 01 sec. through 26 min., 35 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. Instead, the offender scores for both counts should have been listed as three points.[8] *See* RCW 9.94A.589(1)(a), .525(17). We remand and direct the trial court to correct the scrivener's errors so that Garcia's offender scores for both counts are properly listed as three points.

## CONCLUSION

We affirm Garcia's conviction and sentence and remand for the trial court to correct scrivener's errors in the offender score section of the judgment and sentence.

---

[8] Because the sentences ran concurrently and the sentence for count two was less than for count one, correcting Garcia's offender score for count two would not change the actual time served. Neither party seeks resentencing on count two.

No. 52594-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Lee, C.J.

Maxa, J.

22